988 F.2d 126
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Cassandra Y. WILSON, Defendant-Appellant.
 No. 92-10346.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 2, 1993.
Decided March 3, 1993.
 
 Appeal from the United States District Court for the District of Hawaii; No. CR-91-01502-ACK, Alan C. Kay, District Judge, Presiding.
 D.Hawaii
 AFFIRMED.
 Before ALARCON, RYMER and T.G. NELSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Cassandra Y. Wilson appeals from the judgment of conviction and the sentence imposed after a jury found her guilty of involuntary manslaughter, in violation of 18 U.S.C. § 1112, and assault with a dangerous weapon, in violation of 18 U.S.C. § 113(c). Wilson contends that the district court erred in permitting Kevin Jiles to testify that he had sexual intercourse with her one and one-half hours prior to the stabbing. She also argues that the district court erred in denying her motion for a new trial because (a) there was newly discovered evidence that Jiles committed perjury; (b) there was newly discovered evidence that the Government withheld exculpatory evidence; (c) the prosecutor improperly referred to evidence previously excluded by the trial court and improperly commented on the character and credibility of witnesses; and (d) the jury's verdicts of involuntary manslaughter and assault with a dangerous weapon are legally inconsistent. Wilson further contends that the district court erred in increasing Wilson's base offense level for aggravated assault under the Sentencing Guidelines by four levels for use of a dangerous weapon and by five levels for infliction of permanent or life-threatening injury. We affirm the judgment of conviction and the sentence.
 
 I. PERTINENT FACTS AND PROCEDURAL HISTORY
 
 3
 On August 15, 1991, Cassandra Y. Wilson (Wilson) fatally stabbed her husband, Jerome. Wilson was charged with voluntary manslaughter in violation of 18 U.S.C. § 1112 and assault with a dangerous weapon in violation of 18 U.S.C. § 113(c). At trial, Wilson testified that she acted in self-defense. To bolster her self-defense claim, Wilson introduced evidence that she suffered from Battered Woman's Syndrome (BWS). Although the district court acknowledged that BWS is not a defense in this circuit to the charged offenses, it permitted Wilson to introduce evidence of BWS to prove Wilson's state of mind when she stabbed Jerome.
 
 
 4
 There was a conflict in the evidence concerning the events preceding the stabbing. The Government presented evidence that tended to demonstrate that Wilson stabbed her husband in the heat of passion during an argument that ensued after she returned home from a Non-Commisioned Officers Club (NCO Club). Rhonda Virgil, a house guest of Wilson's on the night of the stabbing, testified that she and Wilson went to the NCO Club together at approximately 10:30 p.m. Wilson left the NCO Club without Virgil when it closed at approximately 1:30 a.m. Wilson explained to Virgil that she had to "go somewhere." Virgil testified that Cecil Rivers, a male friend of hers, took her to get something to eat at a Jack in the Box restaurant, and then drove her to Wilson's apartment. Virgil testified that Mr. Rivers parked the car on the side of Wilson's apartment, and waited there with Virgil until Wilson arrived home at approximately 3:30 a.m. Virgil testified that she waited outside in the car until that time because she did not want Jerome to find out that she had returned home from the NCO Club without Wilson.
 
 
 5
 When Wilson returned at approximately 3:30 a.m., she and Virgil entered the apartment together. Virgil testified that Wilson and Jerome argued over the fact that she had taken the car to the NCO Club. Jerome slapped Wilson, and she pushed him. Virgil testified that Wilson told Jerome, "if you keep fucking with me, I'm going to cut you." Virgil did not see a knife in Wilson's possession.
 
 
 6
 Virgil testified that after she intervened to break up the mutual combat, she saw Jerome go to his bedroom and lock the door. Minutes later, Wilson followed Jerome to the bedroom. Virgil stated that Wilson appeared to be "hyped." Virgil further testified that Wilson's son was in the bedroom with Jerome, but that the child was not crying.
 
 
 7
 When she reached the bedroom, Wilson screamed at Jerome to "open this fucking door." After Jerome had opened the door, Virgil observed Wilson and Jerome engaged in a mutual shoving match. At this point, Virgil went to check on the other children. When Virgil returned to the bedroom, she observed that Jerome had Wilson's arms pinned to the bed. Virgil then left the bedroom to call the military police. Shortly after she left, she heard the bedroom door shut. Virgil immediately went back to the bedroom and pleaded for them to open the door. Virgil testified that during this time, she heard Jerome twice call Wilson a "bitch" and a "whore". She heard Wilson scream, "Jerome, stop, stop." She also heard Wilson tell Jerome, "if you don't leave me alone, I'm going to fuck you up."
 
 
 8
 Wilson took the stand in her own defense. She testified that on the night of the stabbing, she left the NCO Club when it closed at approximately 1:30 a.m. On direct examination, Wilson related the following testimony concerning the events preceding the stabbing:
 
 
 9
 Mr. Ney (defense counsel): Now, did you leave there with Rhonda, leave the club with Rhonda?
 
 
 10
 Wilson: No.
 
 
 11
 Mr. Ney: Okay. What did Rhonda do?
 
 
 12
 Wilson: Rhonda went with one of her friends at work. I don't know where they went.
 
 
 13
 Mr. Ney: And what did you do?
 
 
 14
 Wilson: And I went--because we planned to meet back at the house at 3:30, and--so I was talking to Jiles. He was one of my neighbors--
 
 
 15
 Mr. Ney: Okay. Jiles is one of your neighbors?
 
 
 16
 Wilson: Yes.
 
 
 17
 Mr. Ney: His first name is Kevin?
 
 
 18
 Wilson: Yes.
 
 
 19
 Mr. Ney: Do you know what he does for a living?
 
 
 20
 Wilson: He is an MP.
 
 
 21
 Mr. Ney: And did you meet Rhonda back at your house at 3:30?
 
 
 22
 Wilson: Yes.
 
 
 23
 Wilson testified that when she arrived home, Jerome hit her for taking his car to the club. Wilson testified that after she grabbed a steak knife from the kitchen and threatened Jerome with it to make him leave her alone, Jerome went to the bedroom and locked the door. Wilson testified that minutes after Jerome went to the bedroom, she heard her son crying and followed Jerome to the bedroom to make sure that he had not harmed him. Wilson testified that once Jerome opened the door, he resumed hitting her, and she stabbed him in self-defense.
 
 
 24
 On cross-examination, Wilson related the following testimony concerning her behavior with Jiles two hours before the stabbing:
 
 
 25
 Mr. Kubo (the prosecutor): Directing your attention to August 15, 1991, more specifically, between 1:30 and 3:30 that morning, you were with Kevin Jiles, weren't you?
 
 
 26
 Wilson: Yes.
 
 
 27
 * * *
 
 
 28
 * * *
 
 
 29
 Mr. Kubo: And he is a neighbor of yours?
 
 
 30
 Wilson: Yes.
 
 
 31
 Mr. Kubo: --so to speak? You left the club with Kevin Jiles after the club closed; correct?
 
 
 32
 Wilson: No.
 
 
 33
 Mr. Kubo: You did not? Did you get into Kevin's car at any time that night? Or he get into yours?
 
 
 34
 Wilson: Uh--I don't--I'm not sure.
 
 
 35
 Mr. Kubo: You're not sure. But you were with him during that time period?
 
 
 36
 Wilson: Excuse me?
 
 
 37
 Mr. Kubo: But you were with him during that time?
 
 
 38
 Wilson: We was talking.
 
 
 39
 Mr. Kubo: You weren't only talking, though, correct?
 
 
 40
 * * *
 
 
 41
 * * *
 
 
 42
 Mr. Kubo: You weren't only talking, were you?
 
 
 43
 Wilson: Yes, we was.
 
 
 44
 Mr. Kubo: Isn't it a fact that, on that night, between the time of 1:30 to 3:30 that morning, which was approximately an hour and a half to two hours before you stabbed Jerome, you had sexual intercourse with Kevin Jiles; is that not correct?
 
 
 45
 Mr. Ney. Objection ...
 
 Court: Overruled
 
 46
 Wilson: No.
 
 
 47
 Over defense counsel's objection, the Government called Jiles as a rebuttal witness. Jiles testified that he and Wilson left the NCO club when it closed at approximately 1:30 a.m. and drove to a park where they engaged in sexual intercourse.
 
 
 48
 The jury found Wilson guilty of involuntary manslaughter, a lesser included offense of the crime alleged in count I, and guilty of assault with a dangerous weapon, as charged in count II. Wilson made a timely motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. After holding an evidentiary hearing to determine the merits of Wilson's Rule 33 claims, the district court denied the motion. The district judge grouped the counts for sentencing under the Guidelines and sentenced Wilson to sixteen months imprisonment.
 
 II. REBUTTAL EVIDENCE
 
 49
 Wilson contends that the district court erred in permitting Kevin Jiles to testify that he and Wilson had sexual intercourse less than two hours prior to the stabbing. Wilson does not dispute that the Government's questions regarding her behavior with Jiles on the night of the stabbing were within the scope of the direct examination. Rather, she asserts that because she denied having engaged in sexual intercourse with Jiles on the night of the stabbing, the prosecution was precluded under Rule 608(b) of the Federal Rules of Evidence from introducing extrinsic evidence to impeach her credibility.
 
 
 50
 We review a district court's construction of the Federal Rules of Evidence de novo. United States v. Sanchez-Robles, 927 F.2d 1070, 1078 (9th Cir.1991). We review the admissibility of evidence involving factual determinations for an abuse of discretion. Id. Rule 608(b) provides, in pertinent part: "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of a crime as provided in rule 609, may not be proved by extrinsic evidence." Fed.R.Evid. 608(b) (emphasis added). Where evidence of specific instances of conduct is relevant to contradict a witness' testimony concerning a material issue in the case, however, it is admissible notwithstanding Rule 608(b). Sanchez-Robles, 927 F.2d at 1078.
 
 
 51
 Jiles' testimony was relevant to rebut Wilson's testimony concerning her conduct prior to arriving home, and her state of mind at the time of the homicide. The Government offered evidence in its case-in-chief demonstrating that Wilson stabbed her husband during a heated argument that ensued when Wilson returned home from the NCO Club long after it had closed. Virgil testified that Wilson stabbed Jerome just minutes after he called her a whore. Evidence that Wilson had engaged in an act of sexual intercourse with another man just prior to stabbing her husband was admissible to prove her state of mind at the time Jerome accused her of being a whore. Jiles' testimony had a tendency to show that Wilson's homicidal conduct may have been triggered by Jerome's accusation, rather than fear for her life.
 
 
 52
 Wilson contends that any probative value Jiles' testimony may have had concerning Wilson's state of mind on the night of the stabbing was substantially outweighed by its prejudicial effect. The district court is afforded "wide latitude" in weighing the prejudicial and probative effect of evidence under Rule 403 of the Federal Rules of Evidence, and its decision in that regard will not be disturbed absent an abuse of discretion. United States v. Kinslow, 860 F.2d 963, 968 (9th Cir.1988), cert. denied, 493 U.S. 829 (1989). Evidence concerning Wilson's sexual encounter with Jiles less than two hours prior to the stabbing was highly probative to determining whether Wilson stabbed her husband in the heat of passion because of his accurate speculation concerning her unfaithfulness, or whether she had stabbed him in self-defense. The district court did not abuse its discretion in admitting the rebuttal testimony.
 
 
 53
 Wilson also claims that the district court erred in admitting Jiles' testimony as relevant character evidence pursuant to Rules 404(a) and 405(b) of the Federal Rules of Evidence. Because we hold that Jiles' testimony was admissible to rebut Wilson's testimony regarding her state of mind at the time of the stabbing, we do not reach the question whether it was also admissible as character evidence.
 
 
 54
 Wilson also contends that Jiles' testimony was subject to the notice requirement in Rule 404(b) of the Federal Rules of Evidence. The district court expressly stated that it did not admit Jiles' testimony under Rule 404(b). Therefore, Wilson's argument is without merit.
 
 III. DENIAL OF WILSON'S MOTION FOR NEW TRIAL
 
 55
 Wilson contends the district court erred in denying her motion for a new trial for the following reasons: (a) She presented newly discovered evidence that Jiles committed perjury at trial; (b) the Government withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963); (c) the prosecutor committed misconduct during closing argument; (d) the jury's verdicts of involuntary manslaughter and assault with a dangerous weapon are legally inconsistent. None of these contentions has merit.
 
 A. Perjury
 
 56
 Wilson claims that after the trial had concluded, she discovered that Jiles had not told his wife of his sexual encounter with Wilson. She argues that because Jiles indicated at trial that he told his wife of his conduct with Wilson, Jiles committed perjury.
 
 
 57
 We review a district court's denial of a motion for a new trial based on newly discovered evidence for an abuse of discretion. United States v. Endicott, 869 F.2d 452, 454 (9th Cir.1989). An appellant carries a " 'significant burden' " to show that the district court abused its discretion in denying the motion for a new trial. Id. (quoting United States v. Steel, 759 F.2d 706, 713 (9th Cir.1985)). The district court's findings of fact must be accepted unless clearly erroneous. Id.
 
 
 58
 Wilson points to two portions of the record in support of her contention that Jiles testified he told his wife of his sexual encounter with Wilson. The reporter's transcript reflects the following testimony on cross-examination of Jiles:
 
 
 59
 Mr. Ney: They [the Government] asked you about this [his conduct with Wilson] and you said, "Oh, nothing happened?"
 
 
 60
 Jiles: Yes, sir.
 
 
 61
 Mr. Ney: They asked you about it again, a second time; you said, "Nothing happened?"
 
 
 62
 Jiles: Yes, sir.
 
 
 63
 Mr. Ney: They asked you about it a third time; and, again, you told them, "Nothing happened."
 
 
 64
 Jiles: That's right, sir.
 
 
 65
 Mr. Ney: I asked you about it, and you said, "Nothing happened?"
 
 
 66
 Jiles: What you asked me was what did I tell him, and I told you what I told him.
 
 
 67
 Mr. Ney: So you didn't lie to me; you just lied to them three times--is that your testimony today?
 
 
 68
 Jiles: Yes, sir.
 
 
 69
 Mr. Ney. But today, you are not lying; you are telling the truth?
 
 
 70
 Jiles: Yes, I am.
 
 
 71
 Mr. Ney: And the reason is because, oh, you were afraid that you were going to be prosecuted for adultery; is that right?
 
 
 72
 Jiles: No. That might be 25 percent of it. I was worried more about my home than the military.
 
 
 73
 Mr. Ney: And this helps your home life?
 
 
 74
 Jiles: No, it doesn't now, but it's out in the clear, and I can get on with my life.
 
 
 75
 (emphasis added).
 
 
 76
 On redirect examination, Jiles was questioned as follows:
 
 
 77
 Mr. Kubo: You indicated that the immunity was 25 percent of your decision to step forward?
 
 
 78
 Jiles: Yes, Sir.
 
 
 79
 Mr. Kubo: What was the other 75 percent?
 
 
 80
 Jiles: Just--I have a very good home life. What I do is, you know, who's to say, I guess I haven't learned to subdue my own passions yet. But I do have a good home and a good woman. And it bothers me more for Shirley, or for my wife, should I say, to be brought into something that I already did. And that's, basically, that's it.
 
 
 81
 Mr. Kubo: So you want to clear your conscience?
 
 
 82
 Jiles: And I did. And I did when I made that phone call to Officer Sander.
 
 
 83
 At the conclusion of the motion for a new trial proceedings, the district court found that Jiles did not testify at trial that he told his wife that he engaged in sexual intercourse with Wilson. The passages quoted above from the trial transcript do not demonstrate that Jiles testified that he told his wife of his conduct with Wilson. Accordingly, the district court's factual finding on this issue is not clearly erroneous.
 
 
 84
 Wilson also contends that Jiles committed perjury by testifying on cross-examination that he called Officer Sander on his own initiative on December 6, 1991, and admitted that he had sexual intercourse with Wilson. Wilson correctly notes that Jiles testified on direct-examination that he admitted to having engaged in sexual intercourse with Wilson only after the Government granted him immunity from prosecution. Wilson contends that Jiles' testimony on cross-examination that he called Officer Sander to admit his conduct with Wilson before he was granted immunity was perjurious. Wilson refers to the following passages of the trial transcript in support of her claim that Jiles committed perjury on cross-examination:
 
 
 85
 Mr. Ney: They [the Government] didn't ask you to sign a sworn statement when you said, "nothing happened"--did they?
 
 
 86
 Jiles: No, they didn't.
 
 
 87
 Mr. Ney: Only when you said something happened did they ask you to sign a sworn statement?
 
 
 88
 Jiles: When I called them--I called Mr. Sander up and said, "Hey, Mr. Sander, I need to talk to you." They didn't call me; I called them. [I said] "I need to talk to you; I need to see you, Captain Payne," and that's when I told them what happened.
 
 
 89
 Mr. Ney: That was your whole initiative?
 
 
 90
 Jiles: It sure was, sir.
 
 
 91
 Mr. Ney: Well, when was that, Sergeant?
 
 
 92
 Jiles: December--correction; Friday prior to this incident taking place--or
 
 
 93
 Mr. Ney: This trial taking place?
 
 
 94
 Jiles: This trial taking place. Thank you.
 
 
 95
 Mr. Ney: Friday, the 6th of December?
 
 
 96
 Jiles: If that was the date, sir, yes.
 
 
 97
 Mr. Ney: The day before the big commemoration at Pearl Harbor?
 
 
 98
 Jiles: December 7th; correct. December 6th.
 
 
 99
 (emphasis added).
 
 
 100
 Inconsistent testimony "is not tantamount to perjury absent a showing of knowing falsehood." United States v. Flake, 746 F.2d 535, 539 (9th Cir.1984), cert. denied, 469 U.S. 1225 (1985). In its order denying Wilson's motion for a new trial, the district court concluded that Jiles did not knowingly commit perjury. Both Captain Payne and Officer Sander testified to the following facts at the motion for new trial proceedings: Jiles was given the immunity agreement to review on December 6, 1991. However, at that time, Jiles continued to deny his conduct with Wilson. On December 7, 1991, Jiles called Officer Sander on his own initiative to discuss the immunity agreement. On December 8, 1991, Jiles recanted his previous denials concerning his conduct with Wilson and signed the immunity agreement. The court found that the government witnesses had testified truthfully. The court further found that Jiles' testimony on cross-examination concerning his initiation of contact with Officer Sander on December 6, 1991, was the result of his confusion as to dates, rather than an intentional perjurious statement. Wilson has failed to demonstrate that the district court's factual finding in this regard is clearly erroneous.
 
 
 101
 "A prosecutor can never guarantee that a witness will not commit perjury. Her duty is to refrain from knowingly presenting perjured testimony...." United States v. Aichele, 941 F.2d 761, 766 (9th Cir.1991) (emphasis added). The district court also found that the Government had no knowledge of any perjurious statements made by Jiles during the trial. Wilson has failed to demonstrate that this finding is clearly erroneous. Thus, the district court did not abuse its discretion in denying Wilson's motion for a new trial based on her allegations that Jiles committed perjury.
 
 B. Brady Violation
 
 102
 Wilson further contends that the district court abused its discretion in denying her motion for a new trial because newly discovered evidence demonstrated that the Government withheld material evidence in violation of Brady v. Maryland, 373 U.S. at 83. Wilson asserts that the district court erred in denying the motion for a new trial, because she discovered new evidence that the Government had promised Jiles that it would not tell his wife about his adulterous behavior with Wilson if Jiles agreed to testify.
 
 
 103
 In its order denying Wilson's motion for a new trial, the district court stated that Wilson had based her motion for a new trial entirely on a bald assertion that an evidentiary hearing would disclose that the Government made such a promise to Jiles. Although Wilson produced no evidence to support this contention, the court held an evidentiary hearing and allowed the defense to question Captain Payne about this alleged promise.
 
 
 104
 Captain Payne testified at the motion for new trial proceedings that he had told Jiles' his sex life was his own concern, and that his wife would not be contacted by government agents regardless of whether he testified. The district court found that the Government's witnesses testified truthfully. It also found that the only promise made to Jiles in exchange for his testimony was immunity from prosecution by the Army. Wilson's unsubstantiated assertion that the Government's witnesses lied is insufficient to demonstrate that the district court's factual finding is clearly erroneous.
 
 
 105
 Wilson's reliance on United States v. Shaffer, 789 F.2d 682 (9th Cir.1986) in support of her argument the Government had a constitutional obligation to disclose its alleged promise to Jiles even in the absence of an express agreement is misplaced. Shaffer involved the prosecution's failure to disclose to the defense its tacit agreement not to proceed in a civil forfeiture action against a witness in exchange for the witness' testimony. Id. at 690. The government had contended that because there was no explicit agreement with the witness, it had no obligation to disclose anything. Id. The district court granted the defendant's motion for a new trial on the ground that there was an implied-in-fact agreement, and we affirmed. Id. In this case, Wilson has not demonstrated that there was an implied agreement that the Government would refrain from contacting Jiles' wife if he testified. The district court did not abuse its discretion in denying Wilson's motion for a new trial based on her unsubstantiated allegations that the Government withheld exculpatory evidence.
 
 C. Prosecutorial Misconduct
 
 106
 Wilson argues that the district court erred in denying her motion for a new trial because the prosecutor improperly referred to forensic evidence previously excluded by the trial court. We review the denial of a motion for a new trial for an abuse of discretion. United States v. George, 960 F.2d 97, 101 (9th Cir.1992).
 
 
 107
 In the presence of the jury, the Government informed the court that Dr. Trant would testify that four superficial wounds were inflicted on Jerome after the fatal wound. Wilson objected to the proffered testimony because a stipulation had already been entered into the record indicating that Jerome was found with one fatal stab wound and four superficial wounds. At a side bar conference, the prosecutor explained that Dr. Trant's testimony would be offered to impeach Wilson's testimony that she did not continue to stab Jerome after inflicting the fatal wound. The court sustained the objection to Dr. Trant's testimony concerning the wounds. The court held that because Dr. Trant's opinion regarding the order of the wounds was not in the autopsy report, his testimony would result in unfair surprise to Wilson.
 
 
 108
 In his closing argument to the jury the next day, the prosecutor commented that the strands of Wilson's hair found on the bed had probably been cut, rather than pulled out. Defense counsel objected to this comment. The record discloses the following exchange:
 
 
 109
 Mr. Ney: Objection. Mr. Kubo knows what the forensic report of that hair was, that it was pulled out and--
 
 
 110
 Mr. Kubo: Counsel knows the forensic evidence with regard to the stabbing, too.
 
 
 111
 Mr. Ney: Objection....
 
 
 112
 Court: Just stick to whatever is in that exhibit.
 
 
 113
 (emphasis added).
 
 
 114
 A prosecutor's comments to the jury concerning evidence not in the record will not warrant "a new trial unless they are so gross as probably to prejudice the defendant, and any resulting prejudice is not neutralized by the court's instructions." Flake, 746 F.2d at 542 (citations and quotation marks omitted). Wilson has failed to demonstrate that the prosecutor's obscure reference to the contents of a forensic report was prejudicial. The prosecutor did not discuss the order that the wounds were inflicted, nor was the jury told what the forensic evidence showed. Moreover, the district court took immediate steps to prevent any prejudice that might have resulted from a continuation of the prosecutor's improper comments concerning matters outside the record--i.e., defense counsel's knowledge of the forensic report--by instructing the parties to restrict their comments to the stipulation. The court intervened before any prejudicial evidence was revealed. The court's admonition also served to remind the jury that the only evidence as to the stab wounds was the stipulation. Therefore, the district court did not abuse its discretion in determining that the prosecutor's remark, while inappropriate, was not so gross as to prejudice the defendant.
 
 
 115
 Wilson further asserts that the prosecutor's closing argument contained improper comments regarding the credibility and character of defense witnesses. Wilson did not make this argument in her motion for a new trial. Nevertheless, because Wilson objected to these comments at trial, we review the comments for harmless error. United States v. McKoy, 771 F.2d 1207, 1212 (9th Cir.1985). We must consider first whether the statements were improper, and, if so, whether "it is more probable than not that the prosecutor's conduct materially affected the fairness of the trial." Id.
 
 
 116
 Wilson asserts that the following closing remarks by the prosecutor constituted improper attacks on her credibility: 1) "Defendant tried to fool you that she was meek and passive--with her demeanor." 2) "She says Jerome drank constantly, two to three times a week. Nobody supported that. She says he beat her all the time. The police didn't support that. His friends didn't--support that. Their neighbors didn't support that.... Defendant is not worthy of belief and her credibility is incredible." (emphasis added). 3) "[Wilson] is calling Jiles a liar. She is calling Debra Brooks a liar. She is calling Rhonda Virgil a liar. Remember my phrase to you: How can the defendant be so right and the world so wrong?" 4) "Throughout the testimony of the defendant, did she at one time look you in the eye?"
 
 
 117
 It is well established that the prosecution is given reasonable latitude in fashioning closing arguments. United States v. Molina, 934 F.2d 1440, 1445 (9th Cir.1991). "Inherent in this latitude is the freedom to argue reasonable inferences based on the evidence." Id. Where a case "essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence to argue, that one of the two sides is lying." Id.
 
 
 118
 Wilson's trial testimony directly conflicted with that of Jiles and Virgil. Accordingly, the prosecutor's attack on Wilson's credibility as a witness was not improper. Similarly, the prosecutor's reference to Wilson's demeanor on the stand was not misconduct. See United States v. Schuler, 813 F.2d 978, 981 n. 3 (9th Cir.1987) (when defendant chooses to testify, his or her demeanor is a relevant consideration for jury in evaluating defendant's credibility).
 
 
 119
 Wilson also alleges that the prosecutor's closing remarks improperly attacked her character by describing her as an unfaithful wife and a bad mother:
 
 
 120
 If she was so concerned for her kid, did she show it when she went to the club and left the kids home with Jerome? If she was so concerned about the child, did she show it by rushing home when the club closed at 1:30 or 2:00 in the morning? If she was so concerned about her children, did she show it by "talking story" with others afterwards? And if she was so concerned about the welfare of [her son] in Jerome's hand, would she have shown it by then finding--meeting up with somebody and having sex with them?
 
 
 121
 ... Ladies and gentlemen ... this is a case of a defiant wife who went home after--minutes after having been satisfied by another person, who then walked in and got into an argument with her husband.
 
 
 122
 Because Wilson's infidelity was properly before the jury to demonstrate her state of mind at the time of the stabbing, the prosecutor's reference to it was not misconduct. It was also reasonable for the prosecutor to ask the jury to infer that Wilson could not have been afraid to leave her son with Jerome, because she had left him alone with her husband while she entertained herself until 3:30 in the morning.
 
 
 123
 Wilson further contends that the prosecutor's invocation of the Bible in the following manner constituted misconduct: "What about, 'Thou shalt not kill?' What about, 'Thou shall not commit adultery'.... And what about, 'Thou shalt not covet thy neighbor's wife or husband?' " While we agree that the comment was improper, the record shows that the court took swift action to offset any possible prejudice by instructing the jury "not to consider [biblical law] as the law we are to be judging this defendant by. We are only going to be judging the defendant by the law as the court instructs you in the Counts One and Two." Wilson has failed to demonstrate that the jury disregarded the court's instruction, or that the biblical references materially affected the outcome of the trial.
 
 
 124
 Wilson asserts that the prosecutor committed misconduct by stating that "Jerome didn't have the opportunity to testify ... to you and tell you that her allegations of prior abuse is shibai."[1] Wilson objected to this remark. The district court promptly reminded the jury that Jerome was not present to testify to anything, and admonished the prosecutor to "move on." The court further explained to the jury that the arguments made by the lawyers are not evidence. In light of these instructions, we conclude that the prosecutor's improper speculation as to what the deceased might have related to the jury had he lived was not so gross as to materially affect the fairness of the trial.
 
 
 125
 Finally, Wilson argues that the prosecutor improperly attacked the integrity of defense counsel in making the following statement:
 
 
 126
 There is something that every person should know in dealing with the judicial system: If you have got the facts, argue them. If you have got the law, argue it. If you have got the facts and the law, argue it. If you don't have the facts or the law, blow smoke. I couldn't see in this courtroom because the smoke was so thick. Understand, if you will, counsel was merely repeating the position of his client.
 
 
 127
 It is well established that a prosecutor must refrain from launching direct attacks on the integrity of defense counsel. See Bruno v. Rushen, 721 F.2d 1193, 1195 (9th Cir.1983) (comment that defense counsel had agreed to fabricate a defense for profit was direct attack on integrity of defense counsel and constituted reversible error), cert. denied, 469 U.S. 920 (1984). However, in this case, the prosecutor's trite argument was not a direct attack on counsel's integrity. It was, instead, a somewhat clumsy comment on the weight of the evidence presented by the defense. In light of the district judge's admonition to the prosecutor to "just argue the facts," we conclude that this comment did not materially affect the fairness of the trial. Wilson has also failed to demonstrate that the cumulative effect of the prosecutor's comments was prejudicial.
 
 D. Inconsistent Verdicts
 
 128
 Wilson contends that the district court abused its discretion in denying her motion for a new trial because the jury's verdicts of involuntary manslaughter and assault with a dangerous weapon are legally inconsistent. This argument lacks merit.
 
 
 129
 In United States v. Powell, 469 U.S. 57 (1984), the Supreme Court affirmed the long standing principle first articulated by Justice Holmes that " '[c]onsistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment.' " Id. at 62 (quoting Dunn v. United States, 284 U.S. 390, 393 (1932)). Because inconsistent verdicts may be a product of lenity or compromise, any review of the inconsistency would be based on "pure speculation." Id. at 66. Thus, so long as the guilty verdict is supported by the evidence, appellate courts are foreclosed from disturbing inconsistent verdicts. Id. at 69.
 
 
 130
 Wilson argues that the holding in Powell, precluding appellate review of inconsistent verdicts, applies only where the inconsistency is between a guilty verdict and an acquittal, and is inapplicable where the inconsistency is between two guilty verdicts. In Powell, the Supreme Court stated that "[n]othing in this opinion is intended to decide the proper resolution of a situation where a defendant is convicted of two crimes, where a guilty verdict on one count logically excludes a finding of guilt on the other." Id. at 69 n. 8; see also United States v. Daigle, 149 F.Supp. 409, 414 (D.D.C.) (where a "guilty verdict on one count [in the indictment] negatives some fact essential to a finding of guilty on a second count, two guilty verdicts may not stand"), aff'd per curiam, 248 F.2d 608 (D.C.Cir.1957), cert. denied, 355 U.S. 913 (1958).
 
 
 131
 Wilson correctly notes that a verdict of guilty of involuntary manslaughter requires the jury to find that defendant acted with a criminally negligent or reckless mental state, United States v. Keith, 605 F.2d 462, 463 (9th Cir.1979), and that a verdict of guilty of assault with a dangerous weapon requires the jury to find that the defendant acted with the specific intent to commit bodily harm. United States v. Washington, 819 F.2d 221, 226 (9th Cir.1987). Wilson argues that because the two crimes require different mental states, a verdict of guilty of involuntary manslaughter logically excludes a verdict of guilty of assault with a dangerous weapon.
 
 
 132
 Wilson has not cited any authority to support her contention that the verdicts of assault with a dangerous weapon and involuntary manslaughter are legally inconsistent. We are persuaded that the verdicts are not inconsistent. Assuming that the jurors found that Wilson intended to stab Jerome with the specific intent to cause him bodily harm, they could also have consistently found that Wilson acted negligently or recklessly in causing Jerome's death.
 
 
 133
 Furthermore, the Supreme Court's reluctance to disturb inconsistent verdicts which may be the product of lenity or compromise is particularly applicable in this case, where the inconsistency is the result of a conviction on a lesser included offense. See, e.g., United States v. Mathis, 579 F.2d 415, 418 (7th Cir.1978) (where inconsistent guilty verdicts arise because jury chooses to convict defendant of lesser included offense, verdict may be the result of compromise, and should not be inquired into on appeal). The district did not abuse its discretion in denying Wilson's motion for a new trial.
 
 III. SENTENCING GUIDELINES
 
 134
 A. Four Level Increase for Use of a Dangerous Weapon
 
 
 135
 Wilson contends the district court erred in increasing her base offense of aggravated assault under the Sentencing Guidelines by four levels for use of a dangerous weapon (a steak knife). Wilson argues that because the use of a dangerous weapon was already taken into account in classifying the crime as an aggravated assault, increasing the base offense for the use of a dangerous weapon constitutes impermissible double counting. We review the district court's interpretation of the Sentencing Guidelines de novo. United States v. McInnis, 976 F.2d 1226, 1233 (9th Cir.1992).
 
 
 136
 It is true that the use of a dangerous weapon is counted twice in assessing the offender's base level under the Guidelines. First, the use of a dangerous weapon elevates a simple assault to an aggravated assault. U.S.S.G. § 2A2.2, comment. In addition to setting a base offense level for aggravated assault, the Guideline also includes a graduated adjustment schedule. This adjustment schedule instructs the sentencing court to increase the base offense level in accordance with the degree to which the weapon was involved in the assault. For example, if a firearm was discharged, the base offense level increases by five levels; if a dangerous weapon was otherwise used, a four level increase applies; and if the weapon was brandished or its use merely threatened, the base offense level increases by three levels. U.S.S.G. § 2A2.2(b)(2).
 
 
 137
 Wilson urges this court not to follow the graduated adjustment schedule, because its application results in impermissible double counting. We disagree. Without application of the adjustment schedule, a defendant convicted of assault with a dangerous weapon would receive the same base offense level, regardless of whether he or she discharged a firearm, or simply brandished or threatened the use of a weapon. Such a failure to consider the degree to which the weapon was actually involved in the assault would defeat "the Guidelines' fundamental goal of proportionality in sentencing." United States v. Williams, 954 F.2d 204, 207 (4th Cir.1992).
 
 
 138
 Wilson's reliance on United States v. Brown, 943 F.2d 35, 35-36 (9th Cir.1991) (per curiam) in support of her argument that double counting is prohibited when the increase in offense level is predicated on an element of the offense, is misplaced. In Brown, the defendant received consecutive sentences for bank robbery and for use of a firearm during the commission of a felony. We held that the base offense level for the bank robbery conviction should not have been enhanced for the use of a firearm, since the use of the firearm was already considered in setting the base offense level for that felony, and the sentences for the two crimes were consecutive. Id. at 35. We based our holding entirely on the comment to section 3D1.1, prohibiting double counting when imposing consecutive sentences for these crimes. Id. The comment to section 3D1.1 states, "In the case of a conviction under 18 U.S.C. § 924(c), [use of a firearm in commission of a crime of violence] the specific offense characteristic for weapon use in the primary offense is to be disregarded to avoid double counting." U.S.S.G. § 3D1.1, comment. No such prohibition against double counting appears in section 2A2.2. Therefore, we hold that the district court did not err in upwardly adjusting Wilson's base offense level for use of a dangerous weapon.
 
 B. Equal Protection
 
 139
 Wilson further contends that the provision in section 2A2.2 authorizing an increase in the base offense level for use of a dangerous weapon unconstitutionally discriminates against women. Wilson reasons that women need to resort to the use of a weapon to defend themselves against men, but men can inflict the same deadly force against women without resort to a weapon. Wilson claims that penalizing women for obtaining through a weapon the same deadly force that is inherent in a man's fists constitutes gender discrimination in violation of the Equal Protection Clause. Wilson's claim lacks merit.
 
 
 140
 To demonstrate that a gender-neutral statute unconstitutionally discriminates against women, the challenger must show both adverse impact and invidious intent. Personnel Admin. v. Feeney, 442 U.S. 256, 273-74 (1978). Aside from the blanket assertion in her brief that the Guidelines unconstitutionally discriminate against women, Wilson has put forth no evidence demonstrating either disparate impact or invidious intent.
 
 
 141
 Wilson also argues that the district court applied the Guideline in a discriminatory fashion, without taking into account that she was much weaker than Jerome and needed to resort to a weapon to protect herself. This claim is also without merit. The necessity for Wilson to resort to a weapon to protect herself from a man who was physically stronger than she was taken into account by the jury in evaluating the merit of Wilson's self-defense claim. The jury did not believe that Wilson acted in self-defense. The district court's increase in Wilson's base offense level for her use of a dangerous weapon was not error. Wilson has failed to demonstrate that the district court applied the Guideline in a discriminatory fashion.
 
 C. Serious Bodily Injury
 
 142
 Wilson further contends that the district court erred in increasing her base offense level by five levels for inflicting "permanent or life-threatening injury." Wilson offers three arguments in support of this contention: 1) Because the victim's death was already taken into account in setting the base offense level for involuntary manslaughter, it should not have been considered again in establishing her base offense level for aggravated assault. 2) Because the jury found her guilty of involuntary manslaughter, it must have found that the fatal wound was inflicted recklessly. Since assault is a specific intent crime, it is error to increase her offense level to account for the death of the victim, when she did not intend to inflict death. 3) It was error to increase her base offense level for infliction of life-threatening injury, because the victim died, and death is not listed as one of the injuries in section 2A2.2. None of these contentions has merit.
 
 
 143
 First, because the district court grouped the counts of involuntary manslaughter and assault with a dangerous weapon pursuant to section 3D1.2(b), Wilson was sentenced only for assault with a dangerous weapon, as it was the higher offense level even without the upward adjustment for infliction of bodily injury. See U.S.S.G. § 3D1.3(a) (where counts are grouped pursuant to § 3D1.2(a)-(c), sentence is to be determined on the basis of the highest offense level in the group.) Because the counts were grouped and Wilson was sentenced only for aggravated assault, the death of the victim was considered only once in establishing Wilson's sentence.
 
 
 144
 Second, Wilson's claim that she did not have the specific intent to kill Jerome and thus should not have been assessed an increase in her base offense level for life-threatening injury lacks merit. Section 2A2.2(b)(3) increases an offender's base offense level in accordance with the degree of bodily injury sustained by the victim, not the degree of injury that was intended. U.S.S.G. § 2A2.2(b)(3) ("If the victim sustained bodily injury, [offense level is to be increased] according to the seriousness of the injury.") (emphasis added). Thus, once the jury found that Wilson had the specific intent to commit bodily harm, and the court applied the aggravated assault Guideline, it was not improper to increase the offense level in accordance with the degree of the injury sustained.
 
 
 145
 Third, Wilson's argument that it was error to increase her base offense level for "permanent or life threatening injury" because the relevant Guideline does not list death as one of the relevant injuries, is frivolous. Wilson clearly inflicted life-threatening bodily injury. She should not be rewarded with a lighter sentence simply because her victim died.
 
 
 146
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 Wilson asserts that "shibai" is commonly understood by Hawaiians to mean "playacting" in Japanese