

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-20-1999

# Buehl v. Vaughn

Precedential or Non-Precedential:

Docket 97-1241

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Buehl v. Vaughn" (1999). *1999 Decisions.* Paper 14.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/14

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 20, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-1241

ROGER PETER BUEHL,
        Appellant,

v.

DONALD VAUGHN, SUPERINTENDENT OF SCI-
GRATERFORD; THE DISTRICT ATTORNEY FOR
MONTGOMERY COUNTY; THE ATTORNEY GENERAL OF
THE STATE OF PENNSYLVANIA

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

(D.C. Civil Action No. 95-cv-05917)
(District Judge: Honorable John J. Padova)

Argued January 28, 1998

Before: MANSMANN, COWEN, and ALITO, Circuit Judges

(Opinion filed: January 20, 1999)

        David Rudovsky (Argued)
        Kairys, Rudovsky, Epstein,
         Messing & Rau
        924 Cherry Street, Suite 500
        Philadelphia, PA 19107
         Attorney for Appellant

          Mary MacNeil Killinger (Argued)
          Executive Assistant District Attorney
          Chief, Appellate Division
          District Attorney's Office
          Montgomery County Courthouse
          Norristown, PA 19404
           Attorney for Appellees

OPINION OF THE COURT

ALITO, Circuit Judge:

Roger Peter Buehl appeals the denial of his petition for a writ of habeas corpus. Convicted in state court for a triple homicide, Buehl claims that his due process rights were violated and that he received ineffective assistance of counsel at trial and on direct appeal. Because we conclude that Buehl's due process rights were not violated and that his ineffective assistance claims fail to meet the standard of Strickland v. Washington, 466 U.S. 668 (1984), we affirm the judgment of the District Court.

I.

On July 16, 1982, police found the bodies of Courtland Gross, his wife Alexandra Gross, and their housekeeper Catherine VanderVeur shot to death at the Gross estate in Montgomery County, Pennsylvania. The police determined that the murders had occurred in the afternoon or early evening of July 15. The killings appeared to have been carried out as part of a robbery, since drawers had been pulled out of cabinets in several rooms and a cloth covering a safe in the basement had been pulled aside to reveal the dial and handles. The safe was unopened.

The victims at the Gross residence had been shot with .380 caliber bullets, and the police recovered six .380 caliber cartridge casings from the rooms in which the victims were found. The police found Mr. Gross's body near the top of a flight of steps that led to the cellar. He had been shot in the right foot, the abdomen, and the cheek. Mrs. Gross had been shot in the elbow and the eye. Mrs.

2

VanderVeur, who was found tied to a chair in a bedroom, had been shot once in the head. There were no eyewitnesses to these murders, but the Commonwealth assembled the following circumstantial evidence against Buehl.

In June 1982, an acquaintance of Buehl's named Francis Kelly purchased a .380 caliber Walther PPK handgun. Kelly test-fired the gun at a junkyard on or about June 7.[1] In August, after the murders of the Gross household, Kelly returned to the junkyard with a police officer who retrieved two .380 shell casings for ballistics analysis. This analysis revealed that the shell casings from the junkyard were fired from the gun used in the murders at the Gross estate.

On July 7, Joseph Dwyer stole a red Buick Skylark in the City of Philadelphia. Dwyer damaged the Buick's front left tire and lost the tire's hubcap, and he then sold the car to Kelly the next day. On July 10, Kelly lent both the Walther PPK handgun and the Buick to Buehl. Dwyer saw Buehl in possession of the PPK and the Buick that same day. Buehl told Dwyer that he intended to commit robberies on Pine Street in Philadelphia and in Montgomery County, where he would force people to "open the safe." Buehl invited Dwyer to help in these robberies, but Dwyer declined.

On July 13, Buehl purchased 50 cartridges of ammunition for the PPK at Pearson's Sporting Goods Store. Because Buehl initially purchased ammunition that was incompatible with the PPK, he exchanged his original purchase for compatible ammunition and received a credit slip in the amount of $4.50. Buehl signed the form required to buy the ammunition, but his signature was illegible. The store's assistant manager therefore asked for Buehl's driver's license and printed Buehl's name on the form. This manager later identified Buehl as the man who purchased the ammunition.

After Buehl purchased ammunition for the PPK, he used the Buick and the gun to rob the Good Scents Shop on Pine Street in Philadelphia. During the robbery, Buehl shot Nathan Cohn in the ankle and exclaimed: "I'm not playing

_____

1. All of the dates mentioned are in 1982.

3

around." As Buehl left the store, he told an employee: "If anybody comes out here, I'll blow your eyes out." Buehl was observed leaving the store and driving away in the Buick. Buehl admitted to this robbery, and a ballistics analysis determined that the shell casings ejected from the PPK at the store were fired in the same gun as that used at the junkyard and the Gross residence.

On July 15 at around 2:00 p.m., David Mazzocco witnessed a red car that was missing its front left hubcap driving slowly down Berks Road in Worcester Township. Around this same time, Richard Kirkpatrick returned home to find a red Buick Skylark parked in the driveway of his home on Berks Road. When he entered his home, Kirkpatrick was accosted by a man with a pistol. This gunman told Kirkpatrick: "I've shot two other people. I'll shoot you also. I'll start with your leg and work up." He also warned Kirkpatrick: "I'm not fooling." The robber took jewelry from Kirkpatrick's house and fled. Kirkpatrick initially identified a photograph of someone other than Buehl as the robber and made no identification at Buehl's trial. However, on the same day as the Kirkpatrick robbery, Buehl sold jewelry stolen from the Kirkpatrick home to a jeweler in Philadelphia. Moreover, a ballistics expert determined that the .380 cartridge casings found at the Kirkpatrick home came from the gun that was fired at the junkyard, the Pine Street robbery, and the Gross residence.

The Kirkpatrick home is less than a half hour away by car from the Gross residence. At approximately 2:30 p.m. on July 15, an elderly woman wearing a straw hat and a flowered dress bought a box of Domino powdered sugar at the Liberty Bell Meat Market near the Gross residence. When the police discovered Mrs. Gross's body at her home, she was wearing a flowered dress, and a straw hat was found near her head. A box of Domino sugar was in a paper bag with the receipt on the kitchen counter. Catherine Fitzgerald, who cleaned house for the Gross family, testified that Mrs. Gross always put groceries away as soon as she came home.

Between 3:30 and 4:00 p.m. on July 15, Buehl arrived at Joseph LaMotte's office in an agitated state and asked if he could borrow LaMotte's gray Datsun because he had "just

4

pulled a job" and "had to go back and wipe off the fingerprints." Buehl told LaMotte that he could not drive the red Buick because he was afraid of being stopped by the police. When LaMotte refused to loan Buehl his car, Buehl said: "Look, this is my life we're talking about. I just wasted three people and I want your car." LaMotte noticed that Buehl had a gun in his waistband and asked where Buehl had gotten it. Buehl replied that he had obtained it from Kelly. LaMotte loaned Buehl his car but said that he needed it back at about 5:00 p.m. Buehl told LaMotte that he would be driving to Conshohocken. A police officer testified at trial that the Conshohocken exit of the Schuylkill Expressway is about 1.5 miles from the Gross residence. The officer also testified that it was possible to drive from the Gross residence to LaMotte's office in 36 minutes, observing all speed limits. At about 4:45 p.m., Buehl called LaMotte to say that he was on the way back. At about 5:00 p.m., a witness near the Gross residence observed a small gray car that appeared to be a Datsun speeding toward the expressway. Buehl returned to meet LaMotte near his office between 5:00 and 5:30 p.m. Buehl still had a pistol in his waistband. LaMotte and Buehl then picked up Mary Treat, who testified that Buehl looked nervous.

On July 17, Buehl called LaMotte from Atlantic City and asked him about "any big burglaries or anything on the news." When LaMotte said that he didn't remember any such news, Buehl said: "Think. It's important." LaMotte then inquired whether Buehl knew anything about an attempted burglary in which three people were killed, but Buehl did not answer.

On that same day, Buehl met a man named Duon Miller in Atlantic City. Miller noticed that Buehl had in his possession a gold money clip engraved with the image of St. Christopher. Mrs. Gross carried a gold money clip with such an engraving, but it was missing after her murder. Miller testified that Buehl told him that he had killed people with a PPK and had thrown it into a lake or river. Buehl asked Miller if he had ever heard of the Gross family, and he offered Miller the gold St. Christopher money clip. Miller testified that he and Buehl argued about money and that

5

Buehl threatened to "get his PPK and come back and blow [Miller] away."

Peter Ross met Buehl on July 19 in the Tropicana Hotel in Atlantic City. Ross observed Buehl arguing with Miller and threatening to kill him with a PPK. Buehl told Ross that he had Miller's vehicle registration and thus could track Miller down and kill him. Buehl also told Ross that he had killed people before, and he asked if Ross wanted him to kill anyone.

Buehl was arrested on July 30, 1982 for burglary. At the time of his arrest, Buehl had in his possession the credit slip from Pearson's Sporting Goods Store; a paper with Miller's name, address and phone number; and Miller's vehicle registration. A police officer testified at trial that, while Buehl was being transferred to Broadmeadows prison, Buehl asked one of the detectives if the police could match shell casings.

Based on this evidence, Buehl was convicted of the first degree murder of Mr. and Mrs. Gross and Mrs. VanderVeur,[2] and he was sentenced to death. The Pennsylvania Supreme Court affirmed Buehl's conviction on direct review. Commonwealth v. Buehl, 508 A.2d 1167 (Pa. 1986). Buehl then filed a petition under the Pennsylvania Post Conviction Relief Act (PCRA), which was denied by the state trial court. The Supreme Court of Pennsylvania affirmed the trial court's decision. Commonwealth v. Buehl, 658 A.2d 771 (Pa. 1995). Thereafter, Buehl filed a petition for a writ of habeas corpus in federal court, seeking relief with respect to both the guilt and penalty phases of the state proceedings. The District Court granted habeas relief with respect to the penalty phase of Buehl's trial and ordered a new penalty hearing. The Commonwealth did not appeal that ruling. However, the District Court denied Buehl's petition insofar as it sought a new trial on the guilt phase of the state proceedings, and Buehl then took the present appeal.

_____

2. He was also convicted of several lesser offenses.

6

II.

A. Buehl's ineffective assistance of counsel claims. We turn first to Buehl's contention that his Sixth Amendment rights were violated because his trial and appellate counsel were ineffective. Because Buehl filed his federal habeas petition prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), this case must be decided under the law as it existed before the AEDPA became effective. See Lindh v. Murphy, 117 S. Ct. 2059, 2068 (1997) (stating that the AEDPA's amendments to Chapter 153 of Title 28 generally apply only to cases filed after the AEDPA became effective); Death Row Prisoners of Pennsylvania v. Ridge, 106 F.3d 35 (3d Cir. 1997) (concluding that Pennsylvania is not an "opt-in" state for purposes of the AEDPA and that therefore the AEDPA's amendments to Chapter 154 of Title 28 do not apply to habeas petitions in capital cases from Pennsylvania). Under that law, ineffective assistance of counsel claims present mixed questions of law and fact. See Berryman v. Morton, 100 F.3d 1089, 1095 (3d Cir. 1996); McAleese v. Mazurkiewicz, 1 F.3d 159, 166 (3d Cir. 1993). State court findings of fact are presumed correct if they are fairly supported by the record, see 28 U.S.C. S 2254(d) (1994); Berryman, 100 F.3d at 1094, but "[a]n effectiveness claim require[s] the application of a legal standard to the historical-fact determinations," and thus the ultimate question whether counsel was effective is a uniquely legal conclusion subject to de novo review. See id. at 1095 (quoting Townsend v. Sain, 372 U.S. 293, 310 n.6 (1963)); United States v. Cleary, 46 F.3d 307, 309-10 (3d Cir.), cert. denied, 516 U.S. 890 (1995).

We review a claim of ineffective assistance of counsel under the two-pronged test announced in Strickland v. Washington, supra. Under that standard, the defendant must first show that his counsel's performance was so deficient that it fell below an objective standard of reasonableness under prevailing professional norms. 466 U.S. at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. In evaluating counsel's

7

performance, we are "highly deferential" and "indulge a strong presumption" that, under the circumstances, counsel's challenged actions "might be considered sound . . . strategy." Id. at 689; see also Sistrunk v. Vaughn, 96 F.3d 666, 670 (3d Cir. 1996). Because counsel is afforded a wide range within which to make decisions without fear of judicial second-guessing, we have cautioned that it is "only the rare claim of ineffectiveness of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance." United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989).

If a defendant succeeds in establishing that his or her counsel's performance was deficient, the defendant must then show that the deficient performance prejudiced the defense. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. To satisfy this test, it must be shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. Both prongs of the Strickland test must be met before the defendant may obtain relief. United States v. Nino, 878 F.2d 101, 103-104 (3d Cir. 1989).

B. Trial counsel's alleged failure to request a limiting instruction. Buehl's first Sixth Amendment claim is that his trial counsel was constitutionally ineffective in failing to request a limiting instruction with respect to certain "other crimes" evidence. The Commonwealth introduced evidence of the Pine Street and Kirkpatrick robberies to identify Buehl as the killer,3. and at this stage, Buehl does not maintain that the admission of this evidence to establish identity was improper. Buehl contends, however, that his trial attorney was ineffective because he neglected to request a limiting instruction. The District Court assumed that Buehl's trial counsel failed to request a limiting

_____

3. Buehl argues that his trial attorney was ineffective in failing to object
to inadmissible evidence regarding other crimes and bad acts. We address this argument separately in part III of this opinion.

8

instruction and stated that this failure was a "serious lapse in . . . assistance." Buehl v. Vaughn, No. 95-5917, slip op. at 37 (E.D. Pa. Dec. 31, 1996). However, the District Court concluded that Buehl did not receive ineffective assistance of counsel because his defense was not sufficiently prejudiced to satisfy the second prong of the Strickland test. The Court stated that "the evidence of [Buehl's] guilt was so strong that it rendered any such error harmless and[thus] there was no prejudice." Id.

As noted above, the first issue in analyzing Buehl's ineffectiveness claim is whether his trial counsel's performance fell outside the wide bounds of reasonably competent assistance. When evidence of a defendant's other crimes is introduced to show identity, there is"sometimes . . . a substantial danger of unfair prejudice" because the jury may consider the evidence as proof of bad character or propensity to commit the crime charged. United States v. Murray, 103 F.3d 310, 316 (3d Cir. 1997), cert. denied, 119 S. Ct. 254 (1998). To alleviate this risk, counsel may request a cautionary instruction. See generally Lesko v. Owens, 881 F.2d 44, 55 (3d Cir. 1989), cert . denied, 493 U.S. 1036 (1990). In some circumstances, such an instruction may be strongly advisable; in others, counsel may reasonably conclude that it is strategically preferable to omit such a request since the instruction might have the undesired effect of highlighting the other crimes evidence.

In this case, there has been some uncertainty throughout Buehl's post-trial litigation as to whether his trial attorney did in fact request a limiting instruction. As the District Court noted, the Court of Common Pleas, in ruling on Buehl's PCRA petition, stated that Buehl's lawyer requested a limiting instruction with regard to the Pine Street and Kirkpatrick robberies but that the trial court inadvertently neglected to give one. See Buehl v. Vaughn, No. 95-5917, slip op. at 37 & n.7 (E.D. Pa. Dec. 31, 1996). The District Court, however, assumed that the Court of Common Pleas was in error on this point because, when the Pennsylvania Supreme Court reviewed the Court of Common Pleas' decision on appeal, the Justices appeared to take it for granted that Buehl's trial counsel had not sought such an instruction. See id.

9

From our review of the record, we conclude that Buehl's trial counsel did in fact request that the trial judge caution the jury about the proper use of the evidence in question. The record contains a colloquy between trial counsel and the court that was conducted in chambers following the jury charge. In that discussion, Buehl's counsel complained that he had previously asked the court "to instruct the jury that [the murders at the Gross estate] have nothing to do with [the robberies at] Worchester Township or Pine Street" but that the court neglected to give this instruction. Joint App. at 180-81. The judge responded that he realized that he had "not restricted [the jury's] purview to the homicides of the Grosses." Id. at 181. This colloquy is somewhat confusing because it refers to a request that Buehl's counsel apparently made in an unrecorded pre-instruction conference and because the objection was bound up with a discussion of a separate issue, i.e., whether the judge's charge had improperly implied to the jury that the homicides legally qualified as murders. Nevertheless, we believe that the record shows that Buehl's counsel did in fact request that the trial judge instruct the jury on the proper use of the evidence of Buehl's other crimes.4 The

_____

4. Buehl's counsel requested that the court address his objections by cautiously instructing the jury in a way that would avoid "highlighting" the court's alleged errors. Joint App. 181. The court's clarifying instruction stated:

> If I inadvertently used any loaded nouns, pronouns or adjectives let
> me caution you that all the charges surround incidents alleged to
> have occurred on 7/15/82 at 1230 Arrowmink Road, the residence
> of Mr. and Mrs. Courtland Gross and Catherine VanderVeur. The
> charges arise out of the alleged three killings and with respect to the
> responsibility, degree and proof of these alleged crimes are for you,
> the jury, as fact finders and are to be determined from the evidence
> and the evidence alone. Any language by me or counsel referring to
> these incidents are terms used by me or counsel, and are not to
> infringe on your fact finding function in any way whatsoever.

Joint App. at 184-85.

This instruction only briefly cautioned the jury to focus on the killings at the Gross residence and not any acts committed elsewhere. However, Buehl has taken the position that his counsel never requested a limiting instruction; he has not argued that his counsel was ineffective for failing

trial judge responded to this objection by giving a brief supplementary instruction that Buehl has not challenged in this appeal.

As stated above, when a state prisoner's habeas petition alleging ineffective assistance of counsel is considered under pre-AEDPA law, state court findings of fact made in the course of determining the ineffectiveness claim are subject to deference so long as they are fairly supported by the record. See, e.g., Berryman, 100 F.3d at 1094-95. Here, although the Pennsylvania Supreme Court stated that Buehl's counsel failed to request a cautionary instruction, the Court did not discuss the record or acknowledge that the Court of Common Pleas had found that trial counsel made such a request, see Buehl, 658 A.2d at 777-79, and our review of the record convinces us that the Pennsylvania Supreme Court's contrary statement is not fairly supported by the record. Accordingly, since the record reveals that Buehl's counsel did request a limiting instruction and that the trial court was aware of his request, we reject Buehl's argument that his counsel was ineffective for failing to request an instruction.

Moreover, even if the manner in which trial counsel handled the issue of the limiting instruction fell below Sixth Amendment standards, we agree with the District Court's conclusion that Buehl cannot satisfy Strickland's prejudice prong. See Buehl, No. 95-5917, slip op. at 37, 54-59 (E.D. Pa. Dec. 31, 1996).5 In view of the magnitude of the

(Text continued on page 13)

_____

to object to this remedial instruction. Moreover, given counsel's reasonable concern that the court not highlight the evidence of other crimes or the court's use of the term "murders," the failure to object to the instruction would not fall outside the wide bounds of professionally-competent assistance.

5. Noting that "[t]he verdict in this case had overwhelming support," the District Court summarized the evidence as follows:

> Petitioner admitted to having committed the robbery at the Good Scents Shop with a Walther PPK, and the bullet casings found at that site were fired from the same gun that was used in crimes two days later at the Kirkpatrick residence and the Gross estate. On the
> day of the Good Scents Shop robbery, Petitioner purchased ammunition for the Walther at a sporting goods shop.

11

On the afternoon of the murders, Petitioner came to Joseph LaMotte's office asking to borrow LaMotte's car. He told LaMotte he had "just pulled a job" and "had to go back and wipe off the fingerprints." When LaMotte refused his request, Petitioner said, "Look, this is my life we're talking about. I just wasted three people and I want your car." LaMotte noticed that Petitioner had a gun in the waistband of his jeans. LaMotte lent Petitioner his car, a small grey Datsun, and told him he needed the car back about 5:00 p.m. A car matching the description of the one LaMotte lent Petitioner was seen speeding from the direction of the Gross estate toward the direction of the expressway to Philadelphia at about 5:00 p.m. on the day of the murders. Petitioner returned LaMotte's car between 5:15 and 5:30.

There was evidence linking Petitioner to the robbery at the Kirkpatrick residence, which was committed on the same afternoon as the murders at the Gross estate and with the same gun. The day of the robbery at the Good Scents Shop, Petitioner told LaMotte he was driving a red Buick, and LaMotte saw the car from his office window. A red Buick Skylark had been stolen several days before the robbery at the Good Scents Shop; at the time it was recovered, it had a missing left front hubcap. A similar car had been seen near the Good Scents Shop at the time of the robbery there. A witness saw a man he later identified as Petitioner run from the area of the Good Scents Shop at the time of the robbery and speed away in a red Buick Skylark. The man, whom the witness later identified as Petitioner, was carrying a shopping bag. A similar red car, missing a left front hubcap, was also seen on Kirkpatrick's street and a red Skylark was seen at the Kirkpatrick residence at about the time of the robbery there. Items stolen at the Kirkpatrick and Gross residences were linked to Petitioner. The evening of the robbery at the Kirkpatrick residence, Petitioner sold some jewelry to a jeweler in Philadelphia, and most of it was later identified as having been stolen in the robbery at the Kirkpatricks' residence. A gold St. Christopher money clip that Mrs. Gross always used was missing when her body was found. Duon Miller testified that Petitioner had tried to give him a gold St. Christopher money clip, that he had refused, but that he later found the clip in his car and put it in his brief case. Another witness, Eros Peter Simone, saw such a money clip in Miller's briefcase in Zurich some days later.

There were similarities in the crimes committed at the Good Scents Shop, the Kirkpatrick residence, and the Gross estate. In all three, robbery appeared to be the motive, the same gun was used, and in

evidence that the Commonwealth presented, Buehl cannot show that the absence of a limiting instruction deprived him a "a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687.

It is firmly established that a court must consider the strength of the evidence in deciding whether the Strickland prejudice prong has been satisfied. In Strickland, the Supreme Court emphasized that "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." Id. at 695. This is necessary because Strickland's prejudice prong requires a court to determine whether there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different. See Flamer v. Delaware, 68 F.3d 710, 728, 730 (3d Cir. 1995) (citing Lockhart v. Fretwell, 506 U.S. 364, 368-69, 113 S.Ct. 838, 842 (1993); Strickland, 466 U.S. at 695, 104 S.Ct. at 2068), cert. denied, 516 U.S. 1088 (1996); Todaro v. Fulcomer, 944 F.2d 1079, 1085 (3d Cir. 1991). A court simply cannot make this determination without considering the strength of the evidence against the accused. As the Supreme Court stated in Strickland, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Strickland, 466 U.S. at 696. We note that every other circuit has also recognized that, in analyzing Strickland's prejudice prong, a court must consider the magnitude of the evidence against the defendant. See, e.g., Huffington v. Nuth, 140 F.3d 572, 578 (4th Cir.), cert. denied, 119 S. Ct. 444 (1998); Totten v. Merkle, 137 F.3d 1172, 1175 (9th Cir. 1998); United States v. Ortiz, 136 F.3d 161, 166-67 (D.C. Cir. 1998); United States v. Prows, 118 F.3d 686, 692-93 (10th Cir. 1997); Hays v. Alabama, 85 F.3d 1492, 1496 (11th Cir. 1996), cert. denied, 117 S.Ct. 1262 (1997); United

_____

the first two robberies, there was substantial evidence that the same car was used. In all three, the robber shot or threatened to shoot someone in the leg or foot, and there was evidence of a plan of shooting a victim first in a lower limb and working up to the head or eye. In addition, there were numerous other more minor items of evidence that further strengthened the prosecution's case.

Buehl, No. 95-5917, slip op. at 37, 54-59 (E.D. Pa. Dec. 31, 1996).

13

States v. Gregory, 74 F.3d 819, 823 (7th Cir. 1996); Scarpa v. DuBois, 38 F.3d 1, 16 (1st Cir. 1994), cert. denied, 513 U.S. 1129 (1995); United States v. Royal, 972 F.2d 643, 650 (5th Cir. 1992) ("The overwhelming evidence of Defendant's guilt further supports our conclusion that he suffered no prejudice as a result of his counsel's performance."), cert. denied, 507 U.S. 911 (1993); Strouse v. Leonardo, 928 F.2d 548, 556 (2d Cir. 1991); Otey v. Grammer, 859 F.2d 575, 580 (8th Cir. 1988), cert. denied, 497 U.S. 1031 (1990); Krist v. Foltz, 804 F.2d 944, 947 (6th Cir. 1986). We thus agree with the District Court that Buehl is not entitled to habeas relief based on trial counsel's failure to request a limiting instruction relating to the other crimes evidence.6

C. Appellate counsel's failure to argue on dir ect appeal that trial counsel was ineffective in not seeking a limiting instruction. Buehl's next argument is that his right to effective assistance of counsel on direct appeal, see Evitts v. Lucey, 469 U.S. 387, 393–94 (1985), was violated because the attorney who represented him at that stage failed to argue that trial counsel had rendered ineffective assistance in neglecting to request the cautionary instruction discussed above. In making this argument, Buehl relies chiefly on the manner in which the Pennsylvania Supreme Court treated this argument when Buehl raised it in his appeal from the denial of his PCRA petition. Six justices heard the appeal, and as previously noted, all of them seem to have proceeded on the erroneous assumption that

_____

6. In arguing that the Strickland's prejudice prong is met in this case, Buehl contends that in his appeal from the denial of PCRA relief a majority of the Justices of the Pennsylvania Supreme Court concluded that this prong was satisfied. Buehl's brief (which was filed prior to the Supreme Court's decision in Lindh) then argues that "if the habeas statute requires deference because the state courtfinding is factual in nature or because deference is otherwise to be accorded to this state court resolution of a legal issue, petitioner must prevail." Appellant's Br.
at 21. In Part II C of this opinion (dealing with Buehl's contention that his appellate counsel was ineffective), we will address in some detail the Pennsylvania Supreme Court's discussion of the prejudicial effect of trial counsel's asserted error. For present purposes, however, it is enough to note that under the pre–AEDPA version of 28 U.S.C.S 2254, a state court's conclusion regarding either prong of the Strickland test must be reviewed de novo. Berryman, 100 F.3d at 1094.

14

Buehl's trial attorney never requested a cautionary instruction. The plurality, in an opinion written by Justice Montemuro and joined by Justices Zappala and Castille, first stated that Buehl's "trial counsel was ineffective for failing to request a cautionary instruction regarding these crimes because it cannot be said with any reasonable certainty that but for the this [sic] omission the outcome of [Buehl's] trial would not have been different." 658 A.2d at 778-79. The plurality noted, however, that under a provision of the PCRA, a defendant in Buehl's position was entitled to relief "only in those instances in which counsel's ineffectiveness `so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.' " 658 A.2d at 779 (quoting 42 Pa. Cons. Stat. Ann. S 9543(a)(2)(ii) (West 1998)). The plurality then wrote:

> In the instant case, the circumstantial evidence presented by the Commonwealth, including the evidence linking the bullets and shell casings from the robberies of the Good Scents Shop and the Kirkpatrick home to the murder weapon, created overwhelming evidence of Appellant's guilt. Thus, while we are able to say that due to the prejudicial nature of the evidence in question the outcome of Appellant's trial may have been different had counsel requested a cautionary instruction, we are unable to say that due to this omission the adjudication of guilt is unreliable. As a result, appellant's claim does not constitute a basis for relief under the PCRA.

658 A.2d at 779 (footnote omitted).

In a concurrence, Chief Justice Nix stated that he did not see "a substantive distinction between the prejudice prong of the test for ineffectiveness of counsel and the language contained in 42 Pa.C.S. S 9543(a)(2)(ii)" on which the plurality relied. 658 A.2d at 782. Pointing to the "overwhelming proof of [Buehl's] guilt," Chief Justice Nix concluded that Buehl had not "met his burden of establishing that he was prejudiced by counsel's failure to request a cautionary instruction." 658 A.2d at 782-83 (Nix, C.J., concurring).

15

Justice Cappy, joined by then-Justice Flaherty, dissented. 658 A.2d at 783-86 (Cappy J., dissenting). Like Chief Justice Nix, Justice Cappy saw no difference between the prejudice prong of the test for ineffective assistance of counsel and the PCRA provision cited by the plurality. Id. at 785. Referring to Justice Montemuro's opinion, he wrote that "[t]he Majority does not explain why the adjudication of guilt is reliable if the outcome would have been different." Id. (emphasis in original). Then, without discussing the evidence against Buehl, he concluded that the PCRA petition should have been granted. Id. at 786.

Based on these opinions, Buehl argues that he received ineffective assistance of counsel on direct appeal because, if the attorney who represented him at that stage had argued that trial counsel had rendered ineffective assistance in failing to request a cautionary instruction, the Pennsylvania Supreme Court would have reversed his conviction and ordered a new trial. Looking at the votes of the justices in the PCRA appeal, Buehl states: "Three Justices stated that a new trial would have been ordered if the issue was raised on direct appeal and two Justices would have ordered a new trial on direct or collateral attack." Appellant's Br. at 23.

We reject Buehl's argument because he has not satisfied the first prong of the Strickland test. In order to meet the requirements of that prong, he was required to show that his appellate counsel's failure to raise the cautionary instruction argument on appeal fell outside "the wide range of reasonable professional assistance; that is,[he would have to] overcome the presumption that, under the circumstances, the challenged action `might be considered sound [appellate] strategy.' " Strickland, 466 U.S. at 689 (citation omitted). One element of effective appellate strategy is the exercise of reasonable selectivity in deciding which arguments to raise. In this case, an appellate attorney familiar with the record could not have ethically argued that trial counsel's handling of the cautionary instruction issue was constitutionally deficient without calling to the attention of the Pennsylvania Supreme Court the passages in the record that we discussed above and that convince us that Buehl's trial attorney did in fact

16

request a cautionary instruction. Knowing this, a competent appellate attorney could have reasonably concluded he was unlikely to convince the Pennsylvania Supreme Court that trial counsel was constitutionally ineffective in his handling of the cautionary instruction issue and that it was strategically inadvisable to select that argument as one of those to be raised. Furthermore, even if appellate counsel believed that he could convince the Pennsylvania Supreme Court that trial counsel's performance was deficient, appellate counsel could have reasonably concluded that it was unlikely that he could satisfy Strickland's prejudice prong and that it was therefore strategically unwise to select this argument as one of those to be raised.

As previously noted, our examination of the record convinces us that there is no reasonable probability that the jury's verdict would have been any different if a more explicit cautionary instruction had been given. After carefully reviewing the record, the District Court reached the same conclusion. And while we have given careful consideration to the opinions written by Justices Montemuro and Cappy in Buehl's PCRA appeal, those opinions do not convince that competent appellate counsel could not have concluded that the likelihood of satisfying Strickland's prejudice prong was not high enough to justify raising the argument in question. We note that Justice Montemuro characterized that evidence against Buehl as "overwhelming" and that Justice Cappy's opinion does not discuss the evidence and does not explain why there is a reasonable probability that a stronger or more explicit cautionary instruction would have caused the jury to return a different verdict. Consequently, we hold that appellate counsel did not render constitutionally ineffective assistance.

D. Pennsylvania Supreme Court's alleged violat ion of due process. In conjunction with his Sixth Amendment argument regarding his representation on direct appeal, Buehl raises a related due process issue. Buehl contends that the Pennsylvania Supreme Court violated his due process rights because the plurality's interpretation of the standard for obtaining PCRA relief was "untenable or

17

amounts to a subterfuge to avoid federal review of a constitutional violation." Appellant's Br. at 25-26. As previously noted, the plurality invoked 42 Pa. Cons. Stat. Ann. S 9543(a)(2)(ii) (West 1998), which authorizes PCRA relief for "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." Buehl suggests that the plurality deliberately ignored another provision of the same statute, 42 Pa. Cons. Stat. Ann. S 9543(a)(2)(v) (repealed 1995), which permitted relief to be granted for "[a] violation of the provisions of the Constitution, law or treaties of the United States which would require the granting of Federal habeas corpus relief to a State prisoner." Indeed, Buehl charges that the plurality went "so far as to ellipse [this provision] out of the statutory quotation in its opinion . . . ." Appellant's Br. at 26. Buehl contends that the plurality's misinterpretation of the PCRA was " `untenable or amount[ed] to a subterfuge to avoid federal review of a constitutional violation,' " that his due process rights were therefore violated, and that "federal habeas relief is mandated." Appellant's Br. at 26 (quoting Taylor v. Kinchleloe, 920 F.2d 599, 609 (9th Cir. 1990)).

We are not persuaded by this argument. First, the Pennsylvania Supreme Court plurality's interpretation of the PCRA was neither "an `obvious subterfuge to evade consideration of a federal issue,' " Mullaney v. Wilkur, 421 U.S. 684, 691 n.11 (1975) (quoting Radio Station WOW, Inc. v. Johnson, 326 U.S. 120, 129 (1945)) nor a"plainly untenable" interpretation in the sense possibly relevant here.[7] See Ward v. Love County, 253 U.S. 17, 22 (1919). Buehl's charge of subterfuge flies in the face of the errors that the plurality made in his favor -- i.e., its erroneous factual assumption that trial counsel never sought a limiting instruction and its erroneous legal conclusion that

_____

7. The Supreme Court's decision in Ward v. Love County, 253 U.S. 17, 23 (1919), seems to be the origin of the Ninth Circuit's statement in Taylor, 920 F.2d at 609, that a federal court need not accept a state court's interpretation of state law if that interpretation is "untenable." (Taylor cited Knapp v. Caldwell, 667 F.2d 1253, 1260 (9th Cir.), cert. denied, 459 U.S. 1055 (1982), which in turn cited Ward.)

18

Strickland's prejudice prong was met. His suggestion that the plurality deliberately failed to mention 42 Pa. Cons. Stat. Ann S 9543(a)(2)(v) (repealed 1995) in order to reach the result it desired overlooks the fact that the two dissenting justices, who would have granted relief, also relied exclusively on 42 Pa. Cons. Stat. Ann S 9543(a)(2)(ii) (West 1998) and never mentioned 42 Pa. Cons. Stat. Ann S 9543(a)(2)(v) (repealed 1995). Thus, wefind the charge of subterfuge to be groundless.

Nor do we agree with Buehl that the plurality's interpretation of the PCRA was "plainly untenable." Assuming for the sake of argument that a federal habeas court may reject a state court's "plainly untenable" interpretation of state law, we find that this demanding test is not met. Since 42 Pa. Cons. Stat. Ann. S 9543(a)(2)(ii) (West 1998) specifically addresses claims of ineffective assistance of counsel, it was not "plainly untenable" for the plurality (and, indeed, for the entire Pennsylvania Supreme Court) to treat that provision, rather than the more general rule set out in 42 Pa. Cons. Stat. Ann. S 9543(a)(2)(v) (repealed 1995), as the governing provision. Nor was it "plainly untenable" for the plurality to view the test prescribed in 42 Pa. Cons. Stat. Ann. S 9543(a)(2)(ii) (West 1998) (whether the ineffective assistance "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place") as more demanding than Strickland's prejudice prong (whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different"). 466 U.S. at 694. We express no view as to (a) whether we would agree with the pluralit y's interpretation of the PCRA if it were our prerogative to review that interpretation de novo or (b) whether it seems to us that this interpretation was consistent with prior state cases. Limiting ourselves to the narrow question whether the plurality's interpretation was "plainly untenable," we hold that it was not.

Furthermore, even if we were to conclude otherwise, we would still not hold that Buehl is entitled to federal habeas corpus relief. Buehl wants us to overrule the Pennsylvania Supreme Court's interpretation of Pennsylvania law (the

19

PCRA) while deferring to that court's interpretation of federal law (the Sixth Amendment standard for ineffective assistance of counsel). We see no basis for such an approach. If we were to hold that Buehl was entitled to PCRA relief on his ineffective assistance of counsel claim if he could establish "a violation of the federal Constitution that would require the granting of Federal habeas corpus relief," 42 Pa. Cons. Stat. Ann. S 9543(a)(2)(v) (repealed 1995), we would go on to consider whether he had established such a constitutional violation. And as we have already discussed, we conclude that he has not.

E. Trial counsel's failure to object to additi onal "other crimes" evidence. Buehl next argues that his trial counsel was constitutionally ineffective because he failed to object to the introduction of evidence regarding crimes other than the Pine Street and Kirkpatrick robberies. Buehl asserts that his trial attorney should have objected to the admissibility of Peter Ross's testimony that Buehl possessed a knife and killed with a knife, Ross's testimony that Buehl offered to kill Ross's enemies, Detective Richard Natoli's reference to the service of a search warrant on Buehl while he was incarcerated at Delaware County Prison, Miller's testimony that Buehl threatened to "get his PPK" and kill Miller and his friends, and Richard Kirkpatrick's testimony that the person who robbed him claimed to have shot two other people. Buehl argues that none of this testimony was admissible and that it was introduced solely to demonstrate his bad character and his propensity to commit murder.

Observing that these references to other criminal activity were "neither extensive nor detailed," the Pennsylvania Supreme Court rejected Buehl's argument on two grounds. Commonwealth v. Buehl, 658 A.2d 771, 778 n.6 (Pa. 1995). First, it held that Buehl failed to satisfy Strickland's performance prong, since his counsel might have had a reasonable basis for electing not to object to these statements. Because the statements were fleeting, the Court noted that "trial counsel may have wished to avoid emphasizing what might have gone relatively unnoticed by the jury." Id. Second, the Court concluded that there was no reasonable probability that these references changed the

20

outcome of the case. The Court therefore held that any prejudice created by these fleeting remarks was insufficient to establish constitutional violation. See id.

We agree with the Pennsylvania Supreme Court's analysis. An objection to these brief portions of testimony might have simply highlighted the statements for the jury. Accordingly, Buehl's claim fails the first prong of the Strickland analysis because he cannot overcome the presumption that his trial counsel's actions "might be considered sound trial strategy." Strickland, 466 U.S. at 689. Moreover, as the District Court noted, several of the statements appear to have been admissible. For example, Miller's testimony that Buehl threatened to get his PPK is relevant to show that Buehl was in possession of the type of gun used in the murders. However, even if none of this evidence was properly admissible, since the testimony was such a small part of the inculpatory evidence presented against Buehl, there is no reasonable probability that the result of Buehl's trial would have been different if the evidence had been excluded, and therefore Buehl's argument also fails Strickland's prejudice requirement.

F. Trial counsel's failure to object to prosecutor's summation. We next consider Buehl's claim that his trial counsel was ineffective for failing to object to the prosecutor's closing argument.8 Claiming that the prosecutor improperly vouched for witnesses and expressed his personal opinion regarding Buehl's guilt, Buehl maintains that his counsel's failure to object was unprofessional and prejudiced his defense.

A prosecutor's expression of personal opinion about the credibility of witnesses or the guilt of a defendant creates a risk that the jury will "trust the Government's judgment rather than its own view of the evidence." United States v. Young, 470 U.S. 1, 18–19 (1985). However, the fact that a prosecutor made improper statements is insufficient, by

_____

8. The Commonwealth asserts that Buehl failed to exhaust this issue and the issue discussed below regarding inconsistent jury verdicts. However, we conclude that these issues were exhausted because they were presented to the Pennsylvania Supreme Court in Buehl's pro se brief.

21

itself, to require a new trial. To obtain such relief, a defendant must also demonstrate that the prosecutor's improper statements prejudiced his defense. See United States v. Gross, 961 F.2d 1097, 1108 (3d Cir. 1992) (citing United States v. Swinehart, 617 F.2d 336, 339 (3d Cir. 1980)), cert. denied, 506 U.S. U.S. 965 (1992). In examining whether the prosecutor's statements prejudiced the defense, our precedents have considered whether the comments suggested that the prosecutor had knowledge of evidence other than that which was presented to the jury. See id.

In this case, the prosecutor stated that the police investigation had sought the truth, that several of the government witnesses were credible, and that the prosecutor had put his "heart and soul" into the case. These comments did not suggest to the jury that the prosecutor possessed evidence of guilt other than that which had been presented in open court. Rather, the comments merely expressed a belief that the evidence presented to the jury was credible. We have previously held this kind of comment insufficient to establish prejudice to the defense. See id. Furthermore, given the weight of the evidence against Buehl, a reasonable jury would not have found Buehl innocent had the prosecutor refrained from making these assertions. Accordingly, we conclude that Buehl cannot show the requisite prejudice to establish ineffective assistance of counsel on this claim.

G. Trial counsel's failure to object to an ins truction on intent. Buehl's next argument is that his trial counsel's failure to object to the trial court's instruction on intent deprived him of effective assistance of counsel and denied him due process of law. Buehl complains that the following jury charge, which was delivered by the trial court, improperly established a mandatory presumption of intent:

> In the trial of a person for committing or attempting to commit a crime of violence the fact that he was armed with a firearm, used or attempted to be used and had no license to carry the same shall be evidence of his intention to commit said crime of violence.

22

Joint App. 145. Buehl complains that the written verdict slip that the court gave to the jury contained the same language.

Buehl is correct that a state may not establish a mandatory presumption of intent, see Francis v. Franklin, 471 U.S. 311–12 (1985), and the use of the term "shall," rather than "may be," in the instruction at issue seems to offend that rule. Nevertheless, under the harmless error standard set out in Brecht v. Abrahamson, 507 U.S. 619, 632, 637–38 (1993), it is clear that Buehl is not entitled to relief. A writ of habeas corpus should issue only if the reviewing court concludes that the instructional error "had a substantial and injurious effect or influence in determining the jury's verdict." Id. at 623. In this case, the nature of the prosecution's evidence and Buehl's defense rendered the error in this instruction harmless. Both the prosecution and defense either expressly or impliedly conceded that the killings at issue were done intentionally, and therefore the matter of Buehl's intent to kill was not an issue in his defense. Rather, Buehl based his entire defense on a claim of mistaken identity––that he was not the person who committed the murders.

Moreover, it cannot reasonably be doubted that the assailant who attacked the Gross family and Mrs. VanderVeur intended to kill them. The victims were shot repeatedly at close range. One of the victims was shot in the head at close range, and another was tied to a chair before being shot. Accordingly, this case turned on the jury's assessment of the evidence regarding the identity of the killer. We therefore conclude that the court's instructional error on intent did not have a substantial and injurious effect on the jury's verdict.

H. Failure to object to allegedly inconsistent guilty verdicts. Buehl argues that his counsel was also constitutionally ineffective because he failed to object to the entry of inconsistent verdicts. With respect to each of the three victims, the jury found Buehl guilty of first degree murder, third degree murder, and involuntary manslaughter.9 Buehl notes that first and third degree

_____

9. The jury found Buehl not guilty of voluntary manslaughter. 18 Pa. Cons. Stat. Ann. S 2503 defines voluntary manslaughter as follows:

23

murder under Pennsylvania law requires an intent to kill and malice, whereas involuntary manslaughter requires neither.10 Consequently, Buehl argues that the verdicts are inconsistent and that the trial court would have been required to vacate them if his trial counsel had raised a timely objection.11

_____

(a) General Rule. -- A person who kills an indiv idual without lawful
justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) the individual killed; or

(2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

10. 18 Pa. Cons. Stat. Ann. S 2502 (West 1998) provides:

(a) Murder of the first degree.--A criminal ho micide constitutes murder of the first degree when it is committed by an intentional killing.

. . .

(c) Murder of the third degree.--All other kinds  of murder shall be
murder of the third degree. Murder of the third degree is a felony of
the first degree.

(d) Definitions.--As used in this section the following words and phrases shall have the meanings given to them in this subsection:

. . .

"Intentional killing." Killing by means of poison, or by lying in wait,
or by any other kind of willful, deliberate and premeditated killing.

18 Pa. Cons. Stat. Ann. S 2504(a) (West 1998) provides:

A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person.

11. The District Court reconciled Buehl's murder and involuntary manslaughter convictions by reference to the Supreme Court's statement

in United States v. Powell, 469 U.S. 57 (1984), that a court may let stand inconsistent guilty and not-guilty verdicts because it is possible that "the jury, convinced of guilt, properly reached its conclusion on the [offense

In order to determine whether Buehl's trial attorney fell below the minimum level of competence demanded by the Sixth Amendment, we must first consider the governing legal rules regarding inconsistent guilty verdicts at the time when Buehl's trial ended in January 1983. The rule in the federal courts and in the courts of Pennsylvania had long been that a guilty verdict could not be attacked on the ground that it was inconsistent with a not-guilty verdict, see Dunn v. United States, 284 U.S. 390 (1932); Commonwealth v. Kline, 164 A. 124 (1933),[12] and in Harris v. Rivera, 454 U.S 339 (1981), the Supreme Court had held that this rule (generally called the Dunn Rule) was consistent with constitutional requirements. In a decision handed within a year after the Buehl verdicts, the United States Supreme Court reaffirmed the Dunn rule and disapproved decisions of several courts of appeal that had "begun to carve exceptions" to it. United States v. Powell, 469 U.S. 57, 63 (1984). However, in a footnote, the Powell Court noted that its opinion was not "intended to decide the proper resolution of a situation where a defendant is convicted of two crimes, where a guilty verdict on one count logically excludes a finding of guilt on the other." Id. at 69 n. 8. Years later, our court wrote that this exception to the

_____

for which the guilty verdict was returned], and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion of the [offense for which it returned the not-guilty verdict]." See Buehl, No. 95-5917, slip op. at 68-69 (E.D. Pa. Dec. 31, 1996) (citing Powell, 469 U.S. at 64); see also, e.g., United States v. Wilson, 1993 WL 55193 (9th Cir. Mar. 3, 1993). As noted above, however, the Supreme Court has expressly reserved decision on the question whether this rationale applies to cases where the jury returns inconsistent guilty verdicts, and we have stated that logically incompatible guilty verdicts may not stand. See Gross, 961 F.2d at 1106.

12. In this situation, the Supreme Court has reasoned, it is impossible to determine whether the prosecution or defense is prejudiced. It is entirely possible that the guilty verdict represents the jury's true assessment of the evidence and that the not-guilty verdict is based on "mistake, compromise, or lenity." Powell, 469 U.S. at 65. Therefore, it is not assumed that it is the defendant who is prejudiced, but the defendant is protected by the "independent review of the sufficiency of the evidence undertaken by the trial and appellate courts." Id. at 67.

25

Dunn rule "only operates in those situations where a jury has convicted a defendant of two crimes and those convictions are mutually exclusive." United States v. Gross, 961 F.2d 1097, 1107 (3d Cir.), cert. denied, 506 U.S. 965 (1992). We added that "[s]uch a result would be patently unjust because a defendant would be convicted of two crimes, at least one of which he could not have committed." See also Masoner v. Thurman, 996 F.2d 1003, 1005 (9th Cir.) ("a due process challenge to a jury verdict on the ground that convictions of multiple counts are inconsistent with one another will not be considered if the defendant cannot demonstrate that the challenged verdicts are necessarily logically inconsistent. If based on evidence presented to the jury any rational fact finder could have found a consistent set of facts supporting both convictions, due process does not require that the convictions be vacated."),13 cert. denied, 510 U.S. 1028 (1993).

Because the Powell footnote and our opinion in Gross postdate the return of the verdicts at issue here, they are of little relevance in assessing the performance of Buehl's trial attorney. For present purposes, however, we will assume that Pennsylvania law at the time of Buehl's trial, as opposed to the federal constitution, recognized that as a general rule, if a jury returned logically inconsistent guilty verdicts and the defense objected, the judge was obligated to instruct the jury to retire and cure the inconsistency. See Commonwealth v. Brightwell, 424 A.2d 1263 (Pa. 1981). Nevertheless, we do not believe that Buehl's trial counsel "fell outside the wide range of professionally competent assistance," Strickland, 466 U.S. at 690, in failing to object that the jury's verdicts of guilty on the charges offirst and third degree murder "logically exclude[d] afinding of guilt"14 on the charge of involuntary manslaughter, and vice versa.

An examination of the statutory definitions offirst degree murder, third degree murder, and involuntary manslaughter does not reveal any apparent logical

_____

13. Other courts, however, have expressed the view that the Dunn rule extends to cases in which the jury returns inconsistent guilty verdicts. See United States v. Grier, 866 F.2d 908, 929 (7th Cir. 1989).

14. Powell, 469 U.S. at 69 n.8.

26

inconsistency in the verdicts. To be sure, the minimum requisite mens rea for each of these offenses differs, but the Pennsylvania Criminal Code generally follows the Model Penal Code rule that a lesser mens rea may be satisfied by proof of a greater one. See 18 Pa. Cons. Stat. Ann. S 302(e) (West 1998); Model Penal Code S 2.02(5).15 Thus, although involuntary manslaughter requires only recklessness or gross negligence,16 that element may be satisfied by proof that the defendant intentionally killed the decedent, as the first degree murder statute requires. See 18 Pa. Cons. Stat. Ann. S 2502(a) (West 1998). Accordingly, afinding that Buehl intentionally killed the victims (which is implicit in the verdicts of guilty of first degree murder) is logically consistent with a finding that the he caused their deaths through recklessness or gross negligence.

In much the same way, the recklessness or gross negligence required for involuntary manslaughter could be viewed as subsumed within the element of malice needed for murder, which "may be found if the homicide is committed with an intent to kill, with an intent to inflict serious bodily harm, or with reckless disregard of the likelihood of death or serious bodily harm manifesting extreme indifference for the value of human life."17 Justice

_____

15. Model Penal Code S 2.02(5) provides:

> (5) Substitutes for Negligence, Recklessness and Knowledge. When
> the law provides that negligence suffices to establish an element
of
> an offense, such element also is established if a person acts
> purposely, knowingly or recklessly. When recklessness suffices to
> establish an element, such element also is established if a person
> acts purposely or knowingly. When acting knowingly suffices to
> establish an element, such element also is established if a person
> acts purposely.

Similarly, 18 Pa. Cons. Stat. Ann. S 302(e) (West 1998) states:

> Substitutes for negligence, recklessness and knowledge. -- When
> the law provides that negligence suffices to establish an element
of
> an offense, such element also is established if a person acts
> intentionally or knowingly. When acting knowingly suffices to
> establish an element, such element also is established if a person
> acts intentionally.

16. See footnote 10, supra.

17. Commonwealth v. Garcia, 378 A.2d 1199, 1206 n.11 (Pa. 1977) (plurality opinion). Pennsylvania cases define malice as "wickedness of

Roberts's plurality opinion in Commonwealth v. Garcia, 378 A.2d 1199, 1205–07 & n.14 (Pa. 1977), made precisely this point. Justice Roberts carefully explained why the state of mind that suffices to establish the commission of involuntary manslaughter constitutes a lesser included kind of culpability with respect to the malice that is an essential element of murder, and he therefore concluded that the offense of involuntary manslaughter is included within the offense of murder. Id. It is difficult to see how involuntary manslaughter can be included within the offense of murder and yet be logically inconsistent with that offense. For this reason, courts in other jurisdictions have recognized that multiple guilty verdicts for the same conduct that are based on varying levels of mens rea are not mutually exclusive. See, e.g., United States v. Wilson, 1993 WL 55193 (9th Cir. Mar. 3, 1993) (holding that verdicts will not be vacated where an alleged inconsistency flows from a conviction on a lesser included offense); Engram v. Hallahan, 1997 WL 579112 (9th Cir. Sept. 11, 1997) (same).

In view of these authorities, a lawyer whose performance met the Strickland standard of professional competence could have easily failed to perceive at the time in question that the Buehl verdicts might be attacked as inconsistent. This is not to say that Pennsylvania case law provided no basis for such argument. Commonwealth v. Brightwell, 424 A.2d 1263, 1264 (Pa. 1981), which suggested that guilty

_____

disposition, hardness of heart, wanton conduct, cruelty, recklessness of consequences and a mind regardless of social duty." Commonwealth v. Lopez, 627 A.2d 1229, 1230 (Pa. Super. Ct. 1993). Malice may also be found "where the principal acts in gross deviation from the standard of reasonable care, failing to perceive that such actions might create a substantial and unjustifiable risk of death or serious bodily injury." Stidman v. Midvale Sportsmen Club, 618 A.2d 945, 951 (Pa. Super. 1992), appeal denied, 637 A.2d 290 (Pa. 1993). The Pennsylvania Supreme Court has stated that malice "consists of either an express intent to kill or inflict great bodily harm." Commonwealth v. Paquette, 301 A.2d 837, 840 (Pa. 1973); see also Commonwealth v. Seibert, 622 A.2d 361, 366 (Pa. 1993) (citing Commonwealth v. Pigg, 571 A.2d 438 (Pa. Super. Ct. 1990); Commonwealth v. Kersten , 482 A.2d 600 (Pa. Super. Ct. 1984)).

verdicts for murder and voluntary manslaughter were inconsistent,[18] furnished such a basis.[19] But a lawyer's failure to perceive the ground for crafting an argument that might have succeeded is very different from the failure to meet the level of competence required by the Sixth Amendment. We thus hold that Buehl has failed to meet the first prong of the Strickland test.

Nor do we think that the second Strickland prong is satisfied. If Buehl's trial attorney had objected that the verdicts were inconsistent, the most that the trial judge might have done was to direct the jury to retire and reconsider its verdict. Brightwell, 424 A.2d at 1264. In light of the evidence in this case -- which left little doubt that the perpetrator acted with a greater mens rea than that required for involuntary manslaughter -- we see no substantial likelihood that the jury (which subsequently sentenced Buehl to death) would have retracted its verdicts of first and third degree murder and found Buehl guilty of involuntary manslaughter only. It seems very likely that the jury initially found Buehl guilty of involuntary manslaughter, not because it concluded that he killed the victims unintentionally, but because it believed that his intent to kill, while more than required to prove involuntary manslaughter, was nevertheless sufficient. We thus hold that Buehl's trial attorney did not violate his client's Sixth Amendment rights by failing to object to the verdicts as inconsistent.

I. Cumulative prejudice. As a final Sixt h Amendment argument, Buehl contends that, in applying Strickland, we must consider the cumulative prejudicial impact of the constitutional violations that he alleges. However, after

_____

18. A defendant may be convicted of voluntary manslaughter if he acted "under a sudden and intense passion resulting from serious provocation . . . ." 18 Pa. Cons. Stat. Ann. S 2503(a) (West 1998). A defendant may also be convicted of voluntary manslaughter if he intentionally or knowingly kills the victim based on the unreasonable belief that the killing is justified. Id. The presence of these affirmative elements might be viewed as logically inconsistent with malice, but the offense of involuntary manslaughter contains no similar elements.

19. See also Commonwealth v. Kemmerer, 584 A.2d 940, 945 (Pa. 1991), which came well after the Buehl verdicts.

29

conducting this review, we conclude that the District Court correctly determined that the overwhelming evidence of Buehl's guilt prevents him from satisfying Strickland's prejudice prong.

III

We turn now to Buehl's claim that the prosecution violated his due process rights by improperly withholding exculpatory and impeaching evidence. Buehl asserts that the prosecution did not inform his counsel that county detectives had overheard prosecution witness Joseph Dwyer state that he had seen Kelly in possession of his PPK a few weeks after the Gross family was murdered. Buehl also asserts that the government failed to disclose the full extent of Kelly and Dwyer's criminal histories, LaMotte's active probation status, and several alleged favors that the Commonwealth provided to Dwyer. Since Buehl's defense proceeded on the theory that Kelly--who was the owner of the PPK--was the real killer, Buehl asserts that the prosecution's failure to reveal this information deprived him of exculpatory evidence and impeachment material and thus denied him a fair trial.

Due process requires the prosecution to inform the defense of evidence material to guilt or punishment. See Brady v. Maryland, 373 U.S. 83, 87 (1963). The prosecution must also disclose evidence that goes to the credibility of crucial prosecution witnesses. See Giglio v. United States, 405 U.S. 150, 154 (1972); United States v. Starusko, 729 F.2d 256, 260 (3d Cir. 1984). However, the prosecution's failure to disclose such evidence amounts to a violation of due process only if there is a reasonable probability that the jury would have returned a different verdict if the information had been disclosed, or, stated differently, if "the Government's evidentiary suppression undermines confidence in the outcome of the trial." Kyles v. Whitney, 514 U.S. 419, 434 (1995). "[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." Id. at 436-37; see also United States v. Pelullo, 14 F.3d 881, 886 (3d Cir. 1994) ("a Brady violation . . . does not mandate automatic reversal. . . . A reversal is warranted only where

30

the suppression of the Brady evidence undermines confidence in the outcome of the trial."). In evaluating whether the government's failure to turn over Brady or Giglio material undermines confidence in the outcome of the trial, the suppressed evidence is "considered collectively, not item-by-item." Kyles, 514 U.S. at 436.

In this case, the Commonwealth admits that it did not provide the information listed above but asserts that it was not required to provide all of that information. The Commonwealth argues that it was not required to inform Buehl of Dwyer's alleged statement because the prosecution was unable to verify whether Dwyer in fact made such a statement. When the prosecution investigated the detectives' report, Dwyer denied making the statement, and Kelly denied having possession of the PPK after the killings.

The Commonwealth's argument misses the point. If Buehl's counsel had known about Dwyer's alleged statement, he could have asked Dwyer on cross-examination whether he had seen Kelly with the gun after the murders. If Dwyer had denied seeing Kelly in possession of the gun, the prior statement overheard by the detectives could have been used for impeachment, and the statement itself might have been admissible depending on how the detectives recorded Dwyer's statement. See Commonwealth v. Sholcosky, 719 A.2d 1039, 1044 (Pa. 1998) (prior inconsistent statement is admissible as substantive evidence if it is embodied in an electronic, audiotaped or videotaped recording).

Nevertheless, we conclude that Buehl's Brady argument lacks merit because the prosecution's failure to disclose the information is not sufficient to "undermine[ ] confidence in the outcome of the trial." Kyles, 514 U.S. at 434. Dwyer's statement that Kelly had the PPK several weeks after the murders does not seriously undercut the evidence that Buehl was in possession of the gun at the time of the murders. Buehl admitted that he used the PPK to rob the shop on Pine Street just two days before the Gross murders. On the same afternoon as the murders, the same PPK was used to rob the Kirkpatrick home, and Buehl sold jewelry stolen from the Kirkpatricks that same evening. On the afternoon of the murders, Buehl appeared in LaMotte's

31

office with a gun in his waistband and stated that he had just killed three people. Within a few days of the killings, Buehl told Miller that he had killed three people with a PPK, and Buehl threatened to "blow Miller away" with the same weapon. In light of this overwhelming evidence that Buehl had the PPK at the time of the killings and that he was the murderer, we conclude that Buehl was not seriously prejudiced by the inability to use Dwyer's statement for impeachment or to show that Kelly possessed the gun several weeks after the killings.

Additionally, the government's failure to disclose its witnesses' complete criminal histories does not sufficiently undermine confidence in the outcome of his case because Buehl was informed that Dwyer had been convicted of theft and receiving stolen property and that Kelly had at least two prior convictions. Consequently, Buehl had an opportunity to discredit the government's witnesses. In fact, as the District Court noted, Buehl's counsel was able to discredit Dwyer and Kelly effectively at trial.

Moreover, the government's failure to disclose Dwyer's alleged statement, the witnesses' complete criminal histories, and the alleged favors provided to Dwyer is offset by the significant amount of evidence presented against Buehl. Given the weight of this evidence and the mitigating factors discussed above, Buehl cannot show that the government's failure to disclose the information undermined confidence in the outcome of the trial. Accordingly, we reject Buehl's claim.

IV.

For the reasons set out above, we conclude that Buehl's trial and appellate counsel were not constitutionally ineffective and that his due process rights were not violated. We therefore affirm the judgment of the District Court.

A True Copy:
Teste:

  Clerk of the United States Court of Appeals
  for the Third Circuit